**A.Y. McDONALD INDUSTRIES, INC., Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

No. C88–1028.

United States District Court, N.D. Iowa, E.D.

Dec. 30, 1993.

William C. Fuerste, Stephen J. Juergens, Gregg L. Owens, Norman J. Wangberg, Fuerste Carew Coyle, Dubuque, IA, for A.Y. McDonald Industries, Inc.

Daniel A. Bartoldus, Lawrence A. Levy, Abbe L. Koplitz, Rivkin, Radler & Kremer, Uniondale, NY, Greg A. Egbers, Betty, Neuman & McMahon, Davenport, IA, Local Counsel, for Nat. Sur. Corp. and American Ins. Co.

Michael Patrick Murphy, Paul R. Koepff, Kathleen A. Gallagher, Mudge, Rose, & Gutherie, New York City, Robert M. Jilek, Robert C. Tilden, Simmons, Perrine, Albright & Ellwood, Cedar Rapids, IA, Local Counsel, for Ins. Co. of North America.

Terrence E. Kiwala, Laura A. Lewis, Geoffrey A. Bryce, Karen E. Wilson–Howard, Rooks, Pitts & Poust, Chicago, IL, Richard A. Stefani, Gray, Stefani & Mitvalsky, Cedar Rapids, IA, Local Counsel, for Hartford Acc. and Indem. Co., Twin City Fire Ins. Co., and Old Republic Ins. Co.

Daniel Litchfield, Bruce DeGrazia, Steve Taber, Gail Zwenke, David M. Rownd, Burditt & Radzius, Chicago, IL, Terry J. Abernathy, Pickens, Barnes & Abernathy, Cedar Rapids, IA, Local Counsel, for The Aetna Cas. and Sur. Co. and Cincinnati Ins. Co.

John Wharton, Peddicord, Wharton, Thune & Spencer, Des Moines, IA, Employers Reinsurance Corp.

**1168**

Mitchell L. Lathrop, Roger D. Brown, Kathy Waring, Sharon Engel, Adams, Duque & Hazeltine, San Diego, CA, for Puritan Ins. Co.

Nancy Gleason, Thomas B. Keegan, Gleason, McGuire & Shreffler, Chicago, IL, Gerald T. Sullivan, Robert S. Hatala, Crawford, Sullivan, Read, Roemermann, & Brady, P.C., Cedar Rapids, IA, Local Counsel, for Allstate Ins. Co.

William C. Davidson, Carole J. Anderson, Hallie E. Still–Caris, Lane & Waterman, Davenport, IA, American Employers Ins. Co.

Richard M. Hagstrom, Michelle K. Enright, Mark O. Krueger, Paul L. Gingras, Zelle & Larson, Minneapolis, MN, Richard P. Moore, Moyer & Bergman, P.C., Cedar Rapids, IA, Local Counsel, for Employers Ins. of Wausau.

### ORDER

MELLOY, Chief Judge.

This matter appears before the court on the Defendants' resisted motion for summary judgment on the pollution exclusion issue, filed April 1, 1992, and the Plaintiff's resisted motion to certify a question of law to the Iowa Supreme Court, filed June 1, 1992.

The Defendants' motion, authored by American Insurance Company and National Surety Corporation, joined by Insurance Company of North America [1], Hartford Accident & Indemnity Company, Aetna Casualty & Surety Company, Employers Reinsurance Corporation, Allstate Insurance Company, Old Republic Insurance Company, Twin City Fire Insurance Company, Puritan Insurance Company, Cincinnati Insurance Company, and American Employers Insurance Company, asserts that the moving Defendants are entitled to summary judgment in their favor since the "pollution exclusion" clause contained in each of their insurance contracts with the Plaintiff precludes coverage in this case. The Plaintiff's motion moves the court to certify the question of whether the pollu-

tion exclusion clause applies in this case to the Iowa Supreme Court.

### Background Facts

1. From 1949 until October 31, 1983, the Plaintiff manufactured brass valves in its brass foundry on 12th Street in Dubuque, Iowa. In making the brass valves, brass particulate and waste sand (which also contained brass particulate) would be generated. After being run through a series of filtration devices which supposedly removed all of the brass particulate, the waste sand was loaded onto a truck and periodically dumped onto a vacant area behind the foundry. Lead was a component of the brass particulate.

2. On July 29, 1982, the Plaintiff sold its entire 12th Street site to the Iowa Department of Transportation (the "IDOT"). The Plaintiff leased the 12th Street site from IDOT until IDOT took possession on October 28, 1983.

3. On December 6, 1984, the United States Environmental Protection Agency (the "EPA") served the Plaintiff with a complaint, a compliance order, and a notice of opportunity for hearing. These documents were served pursuant to the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub.L. No. 94–580, 90 Stat. 2796 (now codified as amended at 42 U.S.C. § 6901 et seq.). The EPA claimed that the 12th Street foundry site contained traceable amounts of lead in excess of acceptable regulatory levels. *See* 40 C.F.R. § 261.24.

4. On September 6, 1985, the EPA nominated the 12th Street site for inclusion on the Superfund List under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767 (now codified as amended at 42 U.S.C. § 9601 et seq.).

5. A hearing on the RCRA complaint was held on November 5, 6, and 7, 1985, followed by a supplemental hearing on January 6, 1986. The administrative law judge ("ALJ") who heard the matter issued his "Initial Decision" on April 24, 1986. The ALJ found

---

1. The policy issued by Insurance Company of North America does not contain the same pollution exclusion clause that the other insurance policies contain. Thus, since Insurance Company of North America is not similarly situated, this order and opinion will not (directly) apply to the policy issued by Insurance Company of North America.

that the Plaintiff violated RCRA and imposed a civil penalty against the Plaintiff. In addition, the ALJ required the Plaintiff to submit a closure and a post-closure plan.

6. Both the Plaintiff and the EPA appealed the ALJ's decision on the RCRA matter to the administrator of the EPA. On July 23, 1987, the EPA issued its "Final Decision." Essentially adopting the ALJ's "Initial Decision," the EPA found that the Plaintiff violated RCRA. The EPA assessed a civil penalty against the Plaintiff and required the Plaintiff to submit a closure plan, a post-closure plan, and a groundwater assessment plan. The EPA also mandated that the Plaintiff fully implement these plans.

7. In 1986 and 1987 the Plaintiff, IDOT, and the EPA engaged in extensive negotiations concerning cleanup of the 12th Street site under CERCLA, post-closure monitoring and maintenance, and recovery of the EPA's response costs.

8. On August 19, 1987, the Plaintiff, the IDOT, and the EPA entered into a consent order which covered both the RCRA and the CERCLA matters. The consent order required the Plaintiff to (1) design and construct a clay cap over a specified portion of the property; (2) expand its groundwater monitoring system; and (3) develop and implement a post-closure plan for a period of thirty years.

9. The Plaintiff continues to comply with the RCRA final decision of July 23, 1987, and the consent order of August 19, 1987. In complying with the consent order, the Plaintiff has spent in excess of two million dollars.

10. On June 23, 1988, the Plaintiff commenced an action against the Defendants in the Iowa District Court for Dubuque County seeking indemnification and declaratory relief for the past and future costs of complying with the consent order. The Defendants removed the action to this court on July 20, 1988.

11. Between 1949 and 1983, the moving Defendants issued general liability policies and umbrella policies to the Plaintiff.

12. On April 1, 1992, American Insurance Company and National Surety Corporation filed the summary judgment motion currently before the court. The Defendants assert that they are entitled to summary judgment in their favor since the "pollution exclusion" clause contained in each of their insurance contracts with the Plaintiff precludes coverage in this case.

13. On June 1, 1992, the Plaintiff filed the motion to certify currently before the court. The Plaintiff's motion moves the court to certify the question of whether the pollution exclusion clause applies in this case.

## Motion To Certify

The Plaintiff's motion to certify moves the court to certify the following question of law to the Iowa Supreme Court:

Whether, as a matter of Iowa law, repeated dumpings over an extended period of time of foundry sand containing the metal alloy brass which was not known to and reasonably not believed to release one of its chemical constituents, lead, into the environment at the time it was dumped (and later alleged by the EPA to constitute a hazardous waste or hazardous substance because of the alleged release of lead), cannot be a "sudden and accidental" "discharge, dispersal, release or escape" of pollutants, within the meaning of the exception to the 1970 form of pollution exclusion of a comprehensive general liability policy, excess policy or umbrella policy.

Local Rule 23 provides that a question of law may be certified to the Iowa Supreme Court if "it appears there is no controlling precedent in the decisions of the appellate courts of the state" of Iowa. *See also* Iowa Code § 684A.1. For reasons which will be more fully explained in the text to follow, the court concludes that *Weber v. IMT Ins. Co.*, 462 N.W.2d 283 (Iowa 1990), is controlling in this case. Accordingly, the court hereby denies the Plaintiff's motion to certify.

## Summary Judgment

The Defendants' motion moves the court to enter summary judgment in their favor, denying the Plaintiff's claim for indemnification and declaratory relief. Under Rule 56(c) summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a

judgment as a matter of law." Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and "by affidavit or otherwise" designate "specific facts showing that there is a genuine issue for trial." *Robinson v. Monaghan,* 864 F.2d 622, 624 (8th Cir.1989) (quoting Fed.R.Civ.P. 56(e)); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In designating specific facts, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" because Rule 56(c) requires "that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In order to determine which facts are material, courts should look to the substantive law in a dispute and identify the facts which are critical to the outcome. *Id.* at 248, 106 S.Ct. at 2510.

A dispute about a material fact is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment. *Id.* In performing the genuineness inquiry, trial courts should believe the evidence of the party opposing summary judgment and all justifiable inferences should be drawn in that party's favor. *Id.* at 255, 106 S.Ct. at 2513. A court is not "to weigh the evidence and determine the truth of the matter but [instead should] determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510.

When a party opposing summary judgment fails its burden, summary judgment "may and should be granted" if the moving party otherwise satisfies the Rule 56(c) requirements. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Summary judgment is not to be construed as a "disfavored procedural short-cut" but should be interpreted to accomplish its purpose of isolating and disposing of factually unsupported claims and defenses. *Id.* at 327, 106 S.Ct. at 2554. Yet, the Supreme Court also notes that trial courts should act with great caution and may deny summary judgment when it believes

"the better course is to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

To determine the material facts in this case this court must turn to the applicable substantive law. Specifically, this court must interpret the phrase "sudden and accidental" under Iowa law.

### Insurance Contracts in Iowa

In *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am. (INA),* 475 N.W.2d 607 (Iowa 1991), the Iowa Supreme Court summarized the principles of Iowa law which govern the construction and interpretation of terms in insurance policies:

In the construction of insurance policies, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity this is determined by what the policy itself says. *Cairns v. Grinnell Mut. Reinsurance Co.,* 398 N.W.2d 821, 823 (Iowa 1987); Iowa R.App.P. 14(f)(14).

Ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one. *Fraternal Order of Eagles v. Illinois Cas. Co.,* 364 N.W.2d 218, 221 (Iowa 1985). Because insurance policies are in the nature of adhesive contracts, we construe their provisions in a light favorable to the insured. *Cairns,* 398 N.W.2d at 824. So an insurer should clearly and explicitly define any limitations or exclusions to coverage expressed by broad promises. *Id.*

When words are left undefined in a policy we do not give them a technical meaning. Rather we give them their ordinary meaning, one which a reasonable person would understand them to mean. *Farm & City Ins. Co. v. Potter,* 330 N.W.2d 263, 265 (Iowa 1983). We do not give them the meaning only a specialist or expert would understand. *City of Spencer v. Hawkeye Sec. Ins. Co.,* 216 N.W.2d 406, 408–09 (Iowa 1974). And if such words are susceptible to two interpretations, the interpretation favoring the insured is adopted. *North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987). But a mere

disagreement on the part of the parties as to the meaning of terms does not automatically establish an ambiguity. *Id.* In this circumstance the test is an objective one: Is the language fairly susceptible to two interpretations? *Id.*

In searching for the ordinary meaning of undefined terms in a policy, we commonly refer to dictionaries. *See, e.g., Witcraft v. Sundstrand Health & Disability Group Benefit Plan,* 420 N.W.2d 785, 788 (Iowa 1988) (for meaning of "illness"); *North Star,* 402 N.W.2d at 455 (for meaning of "apparatus").

*Id.* at 618–19.

■ Furthermore, the insured must demonstrate that the claimed loss is comprehended by the policy's general coverage provisions. *See* 19 G. Couch, *Couch on Insurance 2d* § 79:315, at 255 (M. Rhodes rev. ed. 1983). If the insured shoulders this burden, then the insurer has the burden to prove the applicability of any exclusion which allegedly precludes coverage. *Kalell v. Mutual Fire & Auto. Ins. Co.,* 471 N.W.2d 865, 867 (Iowa 1991). Likewise, the insurer bears the burden of proof regarding an exception to any exclusion. *Brammer v. Allied Mutual Ins. Co.,* 182 N.W.2d 169, 174 (Iowa 1970).[2]

## The Policies

Each of the policies issued by the moving Defendants provided that the insurance company "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence...." "Occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Each policy also contained a pollution exclusion which read as follows:

This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The Plaintiff argues (1) that since "sudden and accidental" is ambiguous the insurance contract should be construed in its favor; (2) that "sudden and accidental" means "unexpected or unintended"; and (3) that "sudden and accidental" relates not to the initial and continuous discharge of the foundry waste but to the resulting unintended damage caused by the lead contamination. The Plaintiff also contends that the drafting history of the "sudden and accidental" clause demonstrates that only intentional polluters were to be excluded from coverage.

The moving Defendants argue (1) that "sudden and accidental" is unambiguous and

---

**2.** The Defendants dispute this statement. According to the Defendants, once the insurer establishes the applicability of the pollution exclusion, the burden shifts back to the insured to demonstrate the applicability of the pollution exclusion exception (i.e., the last sentence of the pollution exclusion—"but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental"). Although there are a number of cases which support the Defendants' contention, the court concludes that *Brammer* is controlling. Although *Brammer* does not specifically deal with the exception to the pollution exclusion, *Brammer* states with undeniable certainty that "the insurer has the burden of proof regarding an exception to an exception." *Brammer,* 182 N.W.2d at 174 (citing *Olson v. Southern Surety Co.,* 201 Iowa 1334, 208 N.W. 213, 215–16 (1926)). This allocation of proof has been applied to the pollution exclusion exception by a number of courts. *See, e.g., New Castle County v. Hartford Accident and Indemnity Co.,* 933 F.2d 1162, 1181–82 (3rd Cir.1991) (in Delaware the insurer bears the burden of proving that a discharge was "sudden and accidental"); *Remington Arms Co. v. Liberty Mutual Ins. Co.,* 810 F.Supp. 1406, 1413 n. 2 (D.Del.1992) (same under Connecticut law). *But see Northern Ins. Co. v. Aardvark Assocs., Inc.,* 942 F.2d 189, 195 (3rd Cir.1991) (court finds that under Pennsylvania law insured bears the burden of proving that a discharge was "sudden and accidental"); *Gould, Inc. v. CNA,* 809 F.Supp. 328, 337 (M.D.Pa. 1992), *aff'd,* 5 F.3d 1489 (3rd Cir.1993) (same); *Hudson Ins. Co. v. Double D Management Co., Inc.,* 768 F.Supp. 1542, 1545 (M.D.Fla.1991) (applying Florida law.)

necessarily implies temporality; (2) that "sudden and accidental" relates to the Plaintiff's routine discharges and not the damage caused by the discharged waste; and (3) that the Plaintiff's intentions in regards to the resultant lead contamination are irrelevant since the *discharge* of the foundry waste (not the damage caused by the foundry waste) was expected and intended, and neither abrupt nor sudden. The Defendants further argue that the Plaintiff's documentation through extrinsic evidence of the intentions of the insurance industry in drafting the pollution exclusion is irrelevant because the insurance policies are clear on their face.

## A. Sudden

Over the last few years, the courts have debated over the proper definition of the word "sudden" as that word is used in the pollution exclusion clause. Finding the term unambiguous, a number of courts have concluded that the term "sudden" must be given its conventional temporal definition. Thus, to these courts sudden means abrupt or instantaneous, not gradual. *See, e.g., Smith v. Hughes Aircraft Co.*, 10 F.3d 1448, 1452–1453 (9th Cir.1993) (interpreting Arizona and California law); *Bituminous Casualty Corp. v. Tonka Corp.*, 9 F.3d 51, 52–53 (8th Cir.1993) (Minnesota law); *Bureau of Engraving v. Federal Ins. Co.*, 5 F.3d 1175, 1177–78 (8th Cir.1993) (Minnesota law); *Anaconda Materials Co. v. Stoller Chemical Co.*, 990 F.2d 1175, 1178–79 (10th Cir.1993) (Utah law); *Aetna Casualty And Surety Co. v. General Dynamics Corp.*, 968 F.2d 707, 710 (8th Cir. 1992) (Missouri law); *Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co. (USFG)*, 962 F.2d 1484, 1487–90 (10th Cir.1992) (Utah law); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1157 (4th Cir.1992) (New Jersey law); *Northern Ins. Co. of N.Y. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 192–94 (3rd Cir.1991) (Pennsylvania law); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66, 72–73 (1st Cir.1991) (Maine law); *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir.1991) (New York law); *FL`Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 219 (6th Cir.1990) (Michigan law).

Other courts have reached a contrary result, holding that "sudden" means unexpected or unintended. In other words, these courts refuse to recognize the temporal nature of the word "sudden." *See, e.g., CPC Int'l Inc. v. Northbrook Excess and Surplus Ins. Co.*, 962 F.2d 77, 97 (1st Cir.1992) (New Jersey law); *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162, 1199 (3rd Cir.1991) (Delaware law); *Hecla Mining Co. v..New Hampshire Ins. Co.*, 811 P.2d 1083, 1092 (Colo.1991); *Just v. Land Reclamation, Ltd.*, 157 Wis.2d 507, 155 Wis.2d 737, 456 N.W.2d 570, 578–79 (1990); *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686, 690 (1989).

The Iowa Supreme Court has yet to define the term "sudden." Thus, if the opportunity presented itself, this court could endeavor to define the term "sudden." However, as will be made more clear in the section to follow, this court does not have to decide whether the Plaintiff's disposal of the foundry waste was "sudden" since this court concludes that disposal of the foundry waste was "expected" and, thus, not "accidental."

## Accidental

In *Weber v. IMT Ins. Co.*, 462 N.W.2d 283 (Iowa 1990), the Iowa Supreme Court construed the meaning of the term "accidental," as that term is used in the pollution exclusion clause. Since this court is convinced that *Weber* is controlling, this court feels that a detailed analysis of *Weber* is in order. The facts of *Weber* reveal that the Webers operated a farming operation, raising crops and hogs. *Id.* at 284. The Webers used the hog manure from their hog operation to fertilize their crops. *Id.* For approximately fifteen years, the Webers transported the manure in a manure spreader to the Webers' fields over a public road that passed in front of the home and farm of Ralph Newman. *Id.* While the manure was being hauled by Newman's property the manure spreaders dropped manure on the road. *Id.* Newman alleged that the odor from the manure left on the road contaminated his sweet corn crop and made the corn unmarketable. *Id.*

In 1986, Newman filed a suit for nuisance and damages against the Webers claiming contamination of his sweet corn crop and

interference with the enjoyment of his property. *Id.* The Webers looked to their insurer, IMT Insurance Company ("IMT"), to defend them against the Newman suit. *Id.* IMT had issued two insurance policies to the Webers: a Comprehensive Personal Liability Policy (the "liability policy"), and a Personal Umbrella Policy (the "umbrella policy"). *Id.* at 285–86. The liability policy contained a pollution exclusion. *Id.* at 285–88. The umbrella policy did not contain a pollution exclusion. *Id.* at 288–89.

Reviewing the liability policy first, the Iowa Supreme Court started by assuming that the resultant damage caused by the manure spillage was an occurrence and that the pollution exclusion clause was the key to a finding of coverage or noncoverage under the liability policy:

> Webers' liability policy with IMT provided coverage for any "occurrence." The policy, however, did not define "occurrence." We will assume without deciding that there was an occurrence under the liability policy issued by IMT because we conclude that even if there was an occurrence, exclusion (q) (pollution exclusion) of the liability policy is determinative of coverage in this case. The pollution exclusion provides that the liability policy does not apply:
>
> > to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants ... but this exclusion does not apply if such discharge, release or escape is sudden and accidental.

*Id.* at 285.

Honing in on the pollution exclusion clause, the Iowa Supreme Court continued:

> [In] determining whether the liability policy provides coverage, we must determine whether the Webers' hog manure was "waste material," and if it was waste material, whether the discharge of the hog manure was "sudden and accidental."

.    .    .    .    .

"Waste material" is not defined in the policy. Therefore, we are required to give the term its ordinary meaning. We believe that the ordinary meaning of waste material encompasses the hog manure that was spilled on the road in this case, and, we believe that waste material is not ambiguous as it applies in this case.

*Id.* at 285–86 (internal citations omitted).

The Court then dealt with the "sudden and accidental" language of the pollution exclusion clause:

> Jurisdictions have taken different approaches regarding the interpretation of the word sudden. We need not, however, decide whether the spillage of manure on the road was sudden in this case because we conclude that the spillage was not accidental....
>
> We adopt the following definition of accidental for the purposes of this liability policy: an unexpected and unintended event. This definition is consistent with our own definition of accident, as well as the definition for accidental adopted by most courts.
>
> In applying our definition of accidental, we must give meaning to the words within the definition. We have not previously had the opportunity to define expected. However, the Eighth Circuit Court of Appeals has attempted to give meaning to "expected" when confronted with defining the word in an Iowa diversity case. That court stated that for the purpose of an exclusionary clause in an insurance policy, "expected denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions." *City of Carter Lake v. Aetna Casualty & Surety Co.,* 604 F.2d 1052, 1058–59 (8th Cir.1979). In defining substantial probability, the court stated, "the indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur." *Id.* at 1059 n. 4. We agree with the Eighth Circuit's definition and adopt it as our own....

The evidence supports the district court's conclusion that Webers knew or should have known that manure was going to spill on the road when it was transported in their manure spreaders. The evidence established a history, dating back several years, of both spilling and tracking manure onto the road as it was transported past Newman's land to the Webers' fields. Therefore, the district court's factual finding that the spills were expected by Webers is supported by substantial evidence. Because we conclude in our analysis that the manure spills on the road were expected by Webers, the spills were not accidental.

We need not consider whether the spills were intended because our finding that they were expected triggers the application of the pollution exclusion.

We agree with the district court that Webers had no coverage under the liability policy because the pollution exclusion precluded coverage for Webers based on the facts known at the outset of the Newman case. The discharge of waste material on the road by Webers was not accidental in view of the history of such discharges.

*Id.* at 287–88.

■■■ As the final three paragraphs make clear, the Iowa Supreme Court's "accidental" analysis is focused on the discharge of the hog manure—not the resultant damage caused by the discharge. Thus, the pollution exclusion looks at the discharge, whereas the occurrence clause looks to the resultant damage caused by the discharge. So, under the accidental prong of the "sudden and accidental" exception to the pollution exclusion, a court in Iowa should ask: was the discharge

expected or intended? If the discharge was either expected or intended, the discharge could not be accidental, and the pollution exclusion would preclude coverage. Conversely, in determining whether an occurrence has occurred, an Iowa court would ask: was the resultant damage caused by the discharge expected or intended?

The Plaintiff argues that the pollution exclusion also looks at the resultant damage, i.e., whether the insured expected or intended the resultant damage. But, if that were the case, the pollution exclusion would read "if such *damage* was sudden and accidental," not "if such ... discharge was sudden and accidental." Likewise, the Iowa Supreme Court would not have stated: "The evidence supports the district court's conclusion that *the Webers knew or should have known that manure was going to spill on the road when it was transported in their manure spreaders.*" *Weber*, 462 N.W.2d at 287 (emphasis added). Nowhere in the Iowa Supreme Court's liability policy analysis does the Court mention the resultant damage caused by the manure spillage—the Court saves any talk of the resultant damage for its occurrence analysis under the umbrella policy (which did not contain a pollution exclusion clause). Instead of looking at any resultant damage, the Iowa Supreme Court clearly focuses its pollution exclusion analysis on the Webers' expectations surrounding the actual discharge of the hog manure, i.e., whether a reasonable person would expect hog manure to fall off a manure spreader which is traveling on a road.[3]

Hence, the court finds that the Iowa Supreme Court has concluded that the sudden and accidental language of the pollution exclusion focuses on the discharge, whereas the

---

**3.** The court concludes that the Plaintiff has misconstrued the distinction between the Iowa Supreme Court's "sudden and accidental" analysis and the Iowa Supreme Court's "occurrence" analysis. For example, when the Plaintiff argues:

> The Defendant insurers seem to confuse intentional disposal of sand with intentional pollution. *See Weber v. IMT Insurance Co.,* 462 N.W.2d 283, 288 (Iowa 1990). ("Although Webers were aware that they were spilling manure, there is no evidence that the Webers spilled the manure in an effort to intentionally contaminate Newman's sweet corn crop.) The

Iowa Court of Appeals also held that the evidence did not support the trial court's finding that the Webers knew or should have known that the Newman's sweet corn crop would be polluted by manure spilled on the road. Therefore the property damage was not expected. 462 N.W.2d at 289. (Plaintiff's Brief at 14.)

the Plaintiff has cited language from the Iowa Supreme Court's "occurrence" analysis of the Webers' umbrella policy—not from the Iowa Supreme Court's "sudden and accidental" analysis of the Webers' liability policy.

occurrence clause looks to the resultant damage caused by the discharge. This damage/discharge distinction has been recognized by the Eighth Circuit and a number of other courts. *See, e.g., Bituminous Casualty Corp. v. Tonka Corp.*, 9 F.3d 51, 53 (8th Cir.1993); *Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co. (USFG)*, 962 F.2d 1484, 1490–92 (10th Cir.1992); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1157–58 (4th Cir.1992); *Chemical Leaman Tank Lines v. Aetna Casualty and Sur. Co.*, 817 F.Supp. 1136, 1157 (D.N.J. 1993). Indeed, even one of the cases cited by the Plaintiff explicitly recognizes that the sudden and accidental exception to the pollution exclusion focuses on the nature of the discharge, not on the resulting environmental damage. *New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1199–1203 (3rd Cir.1991).

■ As a result, this court concludes that it must answer the following question: Was the Plaintiff's discharge of the foundry waste sand expected or intended? If the discharge was either expected or intended, the discharge could not be accidental, and the pollution exclusion would preclude coverage. The Plaintiff's own undisputed statement of facts provides the answer to this question: "From the opening of the brass foundry in 1949 until October 31, 1983 A.Y. McDonald ... disposed of molding and core sand, remaining after the foundry process, by depositing it on the property. The sand included some brass particles." Plaintiff's Statement Of Material Facts In Support Of Resistances To Motions For Summary Judgment By Defendants at 1. Clearly, the Plaintiff expected the foundry waste sand to be deposited on the property. Since the discharge was expected, the discharge was not "accidental." Hence, the moving Defendants are relieved of their obligation to indemnify the Plaintiff.

## Extrinsic Evidence

The Plaintiff also argues that the court should consider the drafting history of the "sudden and accidental" clause since the drafting history demonstrates that only intentional polluters were to be excluded from coverage. In particular, the Plaintiff believes that the court should consider the representations made to the Iowa Commissioner of Insurance and the various other state insurance commissioners in regards to the pollution exclusion. Forgetting for the moment that Iowa law prohibits the use of extrinsic evidence if a contract term is unambiguous (which the term "accidental" is), the court concludes that the sole letter offered by the Plaintiff as proof that the entire insurance industry, and the Defendant insurance companies in particular, intended the pollution clause to operate a certain way in Iowa can not override the unambiguous holding of *Weber.* The court further finds that the materials submitted to the insurance commissioners of other states have a limited or no effect on Iowa insurance contracts since the representations made in those materials were not made in regards to contracts issued in Iowa.[4]

## Waste Material

■ The Plaintiff also argues that the foundry sand deposited at the 12th Street site was not a waste material within the meaning of the pollution exclusion. Since the policies do not define the term "waste material," the court has to give the term its ordinary meaning. *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am. (INA)*, 475 N.W.2d 607, 619–20 (Iowa 1991). The American Heritage Dictionary of the English Language (W. Morris ed. 1976) defines waste as "any useless or worthless byproduct of a process or the like, refuse or excess material." Webster's Third New International Dictionary (P. Gove ed. 1981) defines waste as

---

4. As the undersigned was making his final revisions to this decision, a letter was received from attorney Daniel G. Litchfield, dated December 17, 1993, which attempts to supplement the record in this matter with affidavits and other materials on the "drafting history" issue. The undersigned wishes to make clear that these materials were neither considered nor thoroughly reviewed prior to issuance of this decision. If the undersigned felt the materials contained in the December 17, 1993, letter were to be considered, the undersigned would have afforded the Plaintiff's counsel an opportunity to respond. Furthermore, the undersigned wishes to assure all parties that these materials were in no way considered in connection with the decision in this matter.

"damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation: material not usable for the ordinary or main purpose of manufacture." Based on these definitions, the court finds that the foundry sand was a waste material within the meaning of the pollution exclusion. The foundry sand that was dumped at the 12th Street site fits squarely within both of these definitions.

As further support for its conclusion, the court points to the following relevant passage from the Iowa district court which originally tried the *Weber* case: "Although [hog manure] is beneficial when handled in a certain manner, it is waste material until it reaches this state or condition. It requires removal, spreading, and dispersal to reach its beneficial condition." *Weber v. IMT Ins. Co.*, No. CL 2645–0786, slip. op. at 3 (Iowa Dist.Ct. Aug. 22, 1988). Like the hog manure in *Weber*, the foundry waste sand required removal from the plant and spreading by bulldozers to reach a beneficial condition, i.e., fill.

The Plaintiff also argues that the Defendants must establish that the Plaintiff knew that the foundry waste sand was contaminated when the Plaintiff dumped the sand on the 12th Street site. Citing *Weber*, the Plaintiff asserts that the foundry waste deposited at the 12th Street site was not a *known* waste material at the time of the dumping, whereas the hog manure in *Weber* was a known waste material.[5] In other words, the Plaintiff argues that the term waste material contains a scienter element. The court disagrees. First of all, the word "waste material" is not prefaced with the word "known" in the pollution exclusion. Secondly, the *Weber* court only said that the hog manure was a waste material, the court did not speak of a *known* or unknown waste material. Accordingly, the court rejects the proposition that the term waste material contains a scienter element. Other courts have reached a similar conclusion. *See, e.g., New Castle County v. Hartford Accident & Indem. Co.*, 970 F.2d

1267 (3rd Cir.1992) ("Knowledge of the nature of the substance discharged is irrelevant." *Id.* at 1272.); *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334 (D.N.J.1992) ("the Court predicts the New Jersey Supreme Court would not find it necessary to be aware of the harmful nature of the pollutants when they were discharged or released." *Id.* at 1352–53).

### West Bend Mutual Case

Subsequent to the submission of this motion for summary judgment, the Iowa Supreme Court decided the case of *West Bend Mutual Insurance Co. v. Iowa Iron Works*, 503 N.W.2d 596 (Iowa 1993). Both the Plaintiff and a number of the Defendants have submitted letter briefs arguing the applicability of the *West Bend* decision to this dispute. Specifically, the Plaintiff asserts that *West Bend* stands for the proposition that the "accidental" language of the pollution exclusion clause looks at the resultant property damage caused by a discharge of waste or pollution.

■ The court cannot agree with the Plaintiff's analysis of the *West Bend* decision. First of all, the pollution exclusion clause in *West Bend* did not contain a "sudden and accidental" exception. *Id.* at 599, n. 2. Secondly, the Iowa Supreme Court's "accidental" analysis was confined to the occurrence clause. *Id.* at 600–01. In other words, the Iowa Supreme Court analyzed the meaning of the word "accident," as that term is used in the occurrence clause. Unlike the pollution exclusion in the case at bar, the occurrence clause in both *West Bend* and the case at bar identifies the resultant damage as its touchstone: an occurrence is "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or *property damage* neither expected or intended from the standpoint of the insured." Thus, unless the insured expected or intended to cause property damage, an accident which results in property damage is an oc-

---

**5.** The Defendants do not argue, for the purposes of this motion, that the Plaintiff knew that the waste sand was contaminated. Indeed, there is strong evidence in the record which shows that the Plaintiff thought the waste sand was innocuous. For example, the record reveals that the

City of Dubuque contacted the Plaintiff and asked if the City could use the waste sand as land fill. Apparently, the EPA's enforcement action was the Plaintiff's first notice of a problem with its waste sand.

currence which triggers the duty to defend. Compare the language of the pollution exclusion clause: "[this liability policy does not apply] to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants [unless] ... such discharge, release or escape is sudden and accidental." Clearly the focus of the "accidental" term in the pollution exclusion is on the discharge, release or escape—not the resultant property damage. In sum, *West Bend* simply states that the "occurrence" clause triggers the duty to defend and the pollution exclusion clause (or any other exclusion) "untriggers" the duty to defend or indemnify if it is clear at the outset that coverage is not mandated under the insurance policy.

### Duty to Defend

This court's ruling granting the motion for summary judgment on the pollution exclusion issue is limited to the obligation of the Defendants to indemnify the Plaintiff for the past and future costs of compliance with the consent order entered into between the Plaintiff and the EPA. To the extent the Defendants' motion for summary judgment requests the court to grant summary judgment on the issue of whether the Defendants had a duty to defend the Plaintiff, and consequently pay the Plaintiff's defense costs, the motion for summary judgment is denied as to that issue.

The Iowa Supreme Court has repeatedly held that the duty to defend is separate and distinct from the duty to indemnify and that the duty to defend is a broader duty. *See, e.g., A.Y. McDonald Indus. v. I.N.A.,* 475 N.W.2d 607, 627 (Iowa 1991); *West Bend Mutual Ins. Co. v. Iowa Iron Works, Inc.,* 503 N.W.2d 596, 601 (Iowa 1993). Likewise, it is also clear from the Iowa Supreme Court's decision in *A.Y. McDonald* that there was an "occurrence" within the meaning of the language of the Defendants' policies. Hence, the Defendants' duty to defend was triggered by the "occurrence." But as the *West Bend* opinion goes on to state, the duty to defend, once "triggered," can be "untrig-

gered" if "it clearly appears there is no duty to indemnify." *West Bend,* 503 N.W.2d at 601.

Thus, based on the *A.Y. McDonald* and *West Bend* decisions and based on the court's obligation to construe the facts in the light most favorable to the Plaintiff, as required in the context of a motion for summary judgment, this court concludes that there are genuine issues of material fact which preclude granting the motion for summary judgment as to the Defendants' duty to defend the Plaintiff. Specifically, there is a material question of fact concerning when it became clear that the pollution exclusion clause was applicable to this case. In this regard, the trier of fact is going to have to look at the facts (as those facts appeared at the outset of the EPA action) and determine whether the EPA was specifically concerned with the continuous discharge of the foundry sand or whether the EPA was generally concerned with the excessive levels of lead on the property. Similarly, the trier of fact should be given an opportunity to review the evidence in the record which shows that the Plaintiff thought the waste sand was innocuous and the evidence in the record which reveals that the City of Dubuque contacted the Plaintiff and asked if the City could use the waste sand as land fill. In short, the trier of fact must be given an opportunity to review the facts of this case as those facts appeared at the outset of the case.

Furthermore, as the court will explain in more detail in a companion Order discussing the Defendants' motion for summary judgment on the late notice issue, there are material issues of fact concerning whether the Defendants were given timely notice of the EPA's actions. Accordingly, the court will deny that part of the Defendants' motion which seeks to obtain a judgment relieving the Defendants of their obligation to defend the Plaintiff.

### Conclusion

In summary, this court finds that the Defendants' motion for summary judgment should be granted as to all the Defendant insurance companies whose policies contained the "sudden and accidental" pollution exclusion clause. The granting of the motion for

summary judgment is limited to the obligation of the insurance companies to indemnify the Plaintiff for the costs incurred in connection with the consent order which was entered into between the Plaintiff, the Iowa Department of Transportation, and the Environmental Protection Agency on August 19, 1987. The motion for summary judgment is being denied as to the obligation of these Defendants to indemnify the Plaintiff for any costs incurred in connection with the defense of the EPA claim.

## ORDER

Accordingly, It Is Ordered:

1. The Plaintiff's motion to certify a question of law to the Iowa Supreme Court, filed June 1, 1992, is denied.

2. The Defendants' motion for summary judgment filed on April 1, 1992, by the American Insurance Company and the National Surety Corporation on the pollution exclusion issue is granted in part and denied in part. The motion for summary judgment is granted to the extent that American Insurance Company, National Surety Corporation, Hartford Accident & Indemnity Company, Aetna Casualty & Surety Company, Employers Reinsurance Corporation, Allstate Insurance Company, Old Republic Insurance Company, Twin City Fire Insurance Company, Puritan Insurance Company, Cincinnati Insurance Company, and American Employers Insurance Company have no obligation to indemnify the Plaintiff for any costs incurred in connection with complying with the consent order entered into between the Plaintiff, the IDOT, and the EPA.

The motion for summary judgment is denied as to that portion of the motion which it seeks to obtain a judgment relieving these Defendants of their duty to pay the defense costs incurred by the Plaintiff in connection with the EPA litigation.

Done and Ordered.