# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2119

_____

| | | |
|---|---|---|
| Modern Equipment Company, a Nebraska Corporation, | * * * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Continental Western Insurance Company, Inc., an Iowa Corporation, | * * * | |
| Appellee. | * | |

_____

Submitted:  January 16, 2003

Filed:  January 28, 2004

_____

Before HANSEN,[1] Chief Judge, BRIGHT and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

_____

[1] The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

Modern Equipment Company ("Modern Equipment") appeals from the district court's[2] grant of summary judgment to Continental Western Insurance Company ("Continental Western") on cross-motions for summary judgment. Modern Equipment sued Continental Western seeking a declaratory judgment establishing Continental Western's duty to defend Modern Equipment in an underlying suit brought by Nebraska Beef Ltd. ("Nebraska Beef") in Nebraska state court. We affirm.

## I. *Facts*

Modern Equipment[3] designed a meat storage-rack system that Nebraska Beef purchased for use in its refrigerated warehouse. Three months after installation, two rack sections collapsed. Nebraska Beef was forced to dismantle, remove, and replace the collapsed rack sections. Within months, two more sections of the Modern Equipment storage-rack system collapsed. These sections were also dismantled and removed by Nebraska Beef. Neither collapse caused physical damage to Nebraska Beef's refrigerated warehouse. However, Nebraska Beef replaced the collapsed rack sections with smaller racks, which ultimately diminished the amount of beef product which could be stored in the warehouse. Six sections of the original rack system remained in place for approximately two years, at which time Nebraska Beef completely replaced Modern Equipment's rack system with a new storage system. The new system had a lower total-storage capacity than the Modern Equipment system.

Nebraska Beef sued Modern Equipment in Nebraska state court. In its suit, Nebraska Beef claimed damages for production and shipping costs, spoilage of

_____

[2] Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

[3] Modern Equipment is engaged in the business of designing, manufacturing, and selling various types of storage and shelving equipment, among other products.

product, decreased cooler capacity, and loss of sales due to the collapsed racks.[4] At all relevant times, Continental Western insured Modern Equipment under a commercial general liability policy and a commercial excess policy.[5] After learning that it had been sued, Modern Equipment tendered its defense to Continental Western and requested an affirmation of coverage.

Continental Western agreed to defend Modern Equipment, but did so under a reservation of rights. Continental Western did not dispute its potential exposure for damage to Nebraska Beef's product–and the resulting spoilation–due to the collapsed rack system, but expressed its intent to deny coverage for the remaining disputed damages.[6] Modern Equipment then brought the instant action–a declaratory-judgment action seeking a declaration that the Continental Western insurance policies provided

---

[4] According to Nebraska Beef, the specific damages it incurred are as follows: (1) $134,609 for the dismantling and removal of the damaged rack system and the cost of outside cold storage; (2) $194,168 for the purchase and installation of a new rack system; (3) $871,217 for loss of earnings arising from a diminished production schedule during the removal and installation periods; (4) $2,420,253 for decreased production because of reduced cooling capacity; (5) $149,386 for damage to the product stored on the racks at the time of each collapse; (6) $126,625 for spoilage of product; (7) $314,434 for loss of sales; 8) $588,196 for increased production and shipping costs; (9) $834,867 in separate damages incurred by Fidelity & Guaranty Insurance Company for direct and indirect costs of removal and replacement of the racks, installation of the replacement racks, and business interruption; (10) $6,036,853 for the loss of a cattle-processing agreement for sixty-six weeks.

[5] The commercial-liability policy provides for up to $2 million in property damages, and the commercial-excess policy provides for an additional $5 million in coverage for the same property damages, after the initial $2 million in coverage is exhausted.

[6] Continental Western also denied coverage for damages claimed by Nebraska Beef for Modern Equipment's alleged breach of contract.

coverage for the disputed damages. Following cross-motions for summary judgment, the district court concluded that Continental Western properly excluded coverage for all of the disputed damages and granted summary judgment in its favor.

## II. *Standard of Review and Legal Standards*[7]

A summary judgment is reviewed de novo. *Darby v. Bratch*, 287 F.3d 673, 678 (8th Cir. 2002). Summary judgment is inappropriate if there is a genuine dispute about a material fact. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Insurance disputes are particularly well suited for summary judgment because the proper construction of an insurance contract is always an issue of law for the court. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Federated Mut. Ins. Co.*, 596 N.W.2d 546, 550 (Iowa 1999). We do not apply the rules of construction if an insurance contract is unambiguous. *Kirwan v. Chicago Title Ins. Co.*, 612 N.W. 2d 515, 523 (Neb. Ct. App. 2000). When the words of an insurance contract are unambiguous, the intent of the parties is determined by the language of the policy itself. *A.Y. McDonald Indus., Inc. v. Ins. Co. North America*, 842 F.Supp. 1166, 1170 (N.D. Iowa 1993), *aff'd* 48 F.3d 1223 (8th Cir. 1995). If the terms of an insurance contract are clear, they are to be accorded their plain and ordinary meaning. *Farm Bureau Ins. Co. of Nebraska v. Bierschenk*, 548 N.W.2d 322, 324 (1996). These standards apply equally to exclusions. *Farm and City Ins. Co. v. Gilmore*, 539 N.W.2d 154, 157 (Iowa 1995).

---

[7] We note the discord between the parties regarding which state's law should govern this dispute. Continental Western argues that Nebraska law should govern; Modern Equipment argues that Iowa law should govern. However, we note–and the parties agree–that the insurance laws of these two states are not substantially different. If there is not a true conflict between the laws of Nebraska and Iowa on the pertinent issue, then no choice-of-law is required. *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir. 1995). Accordingly, we will not make a choice of law determination.

Modern Equipment does not claim, and we do not find, that either the policy's definitions or its exclusions are ambiguous. Hence, we will not resort to rules of construction. *Farm & City Ins. Co. v. Anderson*, 509 N.W.2d 487, 490–91 (Iowa 1993). Accordingly, Modern Equipment is not entitled to have the policy construed in its favor. Rather, we will attempt to ascertain the intention of the parties from the plain meaning of the policy. *Ploen v. Union Ins. Co.*, 573 N.W.2d 436, 442 (Neb. 1998).

### III. *Policy Language*

To establish its claim against Continental Western, Modern Equipment has the initial burden of proving that Nebraska Beef's disputed claims are "comprehended by the policy's general coverage provisions." *A.Y. McDonald*, 842 F. Supp. at 1171. Once this burden is met, Continental Western must in turn prove the "applicability of any exclusion which allegedly precludes coverage." *Id*. The burden then shifts back to Modern Equipment to prove, if applicable, any exception to the exclusion. *Id*.

To begin our analysis we consider the language contained in the commercial general liability policy[8] issued by Continental Western. The policy states in relevant part:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage"[9] to which this

---

[8] Both the general liability policy and the excess policy contain the same exclusion for impaired property or property not physically injured. In the liability policy it is excluded under part (m); in the excess policy it is excluded under part (l).

[9] "Property damage" is defined in the policy as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to

insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence"[10] and settle any claim or "suit" that may result.

It is undisputed that physical injury occurred to tangible property (the Nebraska Beef food products stored on the racks) when several sections of Modern Equipment's storage-rack system collapsed. Continental Western concedes coverage for that injury, but does not concede the amount of the damage incurred. Modern Equipment bases its further coverage claim on the conclusion that the diminished use of Nebraska Beef's warehouse constitutes property damage within the meaning of the policy. We agree with this conclusion, and find that Modern Equipment has satisfied its initial burden of establishing that Nebraska Beef incurred "property damage." The burden now shifts to Continental Western to establish that a policy exclusion applies.

Continental Western limited its coverage by two relevant exclusions: Exclusion (k)–titled "Damage to Your Product"–and Exclusion (m)–titled "Damage to Impaired Property or Property Not Physically Injured." Continental Western bases its coverage denial on Exclusion (k). Exclusion (k) prohibits recovery for "property damage" to "'[the insured's] product' arising out of it or any part of it." Essentially, this exclusion prevents coverage for harm occurring to the rack system itself, because of its own defects or performance deficiencies. According to the policy, "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of [Modern Equipment's storage-rack system]" are a part of the

occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

[10] "Occurrence" is defined in the policy as "an accident . . . ."

insured's "product." This exclusion also eliminates coverage for any "loss of use" of the racks.

A separate exclusion–Exclusion (m)–extinguishes coverage for "property damage to 'impaired property' or property that has not been physically injured arising out of: (1) A defect, deficiency, inadequacy or dangerous condition" in Modern Equipment's storage-rack system. However, Exclusion (m) does not apply if the property damage is a result of "sudden and accidental physical injury to '[the insured's] product' or '[the insured's] work' after it has been put to its intended use."

Thus, Exclusion (k)'s effect is to exclude coverage for damages to Modern Equipment's rack system caused by its own defects including any damages for the loss of use of the rack system. Exclusion (m)'s effect is to exclude damages for the loss of use of property–other than the insured's product–that is less useful because of a defect in the insured's product, except when the loss of use is caused by a sudden accident after the insured's product is put to its intended use. In sum, any damages flowing from a loss of use of Modern Equipment's storage-rack system are not covered, but any loss of use of Nebraska Beef's warehouse (attributable to the collapse of the rack system) is covered. This conclusion is consistent with the purpose of a commercial general liability policy, which is to provide coverage for tort liability for physical damage to others, and not to insulate an insured from economic losses flowing from breach of its contractual duties.

IV. *Analysis*

Continental Western's duty to defend depends upon the cause of the disputed damages. If the damages flow from the loss of the use of Modern's rack system due to the inadequacy of the rack system designed by Modern Equipment then coverage is excluded. If the claimed damages instead flow from Nebraska Beef's inability to use the interior space of its warehouse, coverage exists, and Continental must defend Modern Equipment. Predictably, Continental Western argues that the damages arise

solely from the failed rack system and are thereby–under the language of Exclusion (k)–excluded from coverage. Modern Equipment responds that the damages flow from an impairment to the warehouse, and thus the claim should be analyzed under Exclusion (m), as opposed to Exclusion (k). Specifically, Modern Equipment argues that the damages are covered because the Modern Equipment rack system had been put to its intended use and the warehouse became "impaired property" due to the "sudden and accidental" fall of several rack sections.

Both parties cite to *Ellsworth-Williams Co-op Co. v. United Fire & Cas. Co.*, 478 N.W.2d 77 (Iowa App. 1991) as support (or distinction) for their respective positions. In *Ellsworth*, coverage was sought–under a substantially similar policy–for lost revenues resulting from a loss of use of seven grain-storage bins. Four of the bins and an overhead conveying system–constructed by the insured–failed. The overhead conveying system was a required operational component of the three preexisting bins, which were not constructed by the insured. The owner of the bins brought an action against the insured to recover for losses sustained from the loss of use of the four negligently-constructed bins and the three preexisting bins.

The *Ellsworth* court analyzed the damages attributable to the negligent construction of the four newest bins under a contract provision mirroring Exclusion (k). The court determined that this exclusion "explicitly exclude[s] liability for property damage to the insured's products and to work performed by the insured." *Id.* at 82. The court, however, concluded that the loss of use damage to the preexisting grain bins, resulting from their dependence on the defective conveying system, was covered under language almost identical to the exception language of Exclusion (m). The court reasoned that 1) the preexisting bins were not built by the insured, and thus qualified as "other tangible property"; 2) the physical injury to the insured's product (the overhead conveying system) was "sudden and accidental"; and 3) the injury occurred after the conveying system had been put to "use by any other person or

organization other than an insured"–in this case, by Ellsworth. *Ellsworth-Williams Co-op, Co.*, 478 N.W.2d at 81.

The facts of this case are fundamentally different than those presented in *Ellsworth*. First, the storage racks were not an integral component of Nebraska Beef's freezer and cooler warehouse. Certainly, the analysis would be different if the insured's product had been an air-conditioning unit or a door seal, the failure of which would impair the whole of the warehouse by not allowing it to function as a freezer and a chiller. Second, unlike the preexisting bins in *Ellsworth*, the Nebraska Beef warehouse was not rendered inoperable. The racks' collapse did not prohibit the freezer from operating as a freezer. Third, Nebraska Beef continued to use its warehouse and much of the Modern Equipment rack system. Modern Equipment argues that there is "no legally appropriate or correct reasoning" to require that the warehouse be "totally inoperable." We agree that circumstances could exist where a "sudden and accidental" event could cause a loss of use so severe that the warehouse is rendered practically inoperable. For example, in this case, had the racks collapsed in a position that prohibited ingress or egress from the warehouse area, while not literally inoperable, we would consider the warehouse to be inoperable in a practical sense. In such a scenario, the mitigation required for the freezer to once again become "operable" would presumably be as immediate as the accident causing the loss of use in the first place. However, in this case the alleged loss of use, i.e., the ability to store the same amount of beef product in it after the collapse as before the collapse occurred, was limited, thereby allowing a significant level of use of the majority of the warehouse space. If we were to consider a marginally less useful warehouse to be "inoperable," the damages flowing from the "sudden and accidental" failure of a portion of the shelving unit could accrue at Nebraska Beef's leisure–here, over a time period in excess of two years.

An examination of the damages claimed by Nebraska Beef illustrate this point. The majority of the damages that it claims are not attributable to the loss of use of its

warehouse during the time period that the damaged racks were dismantled and removed. Instead, the bulk of the damages flow from the diminished shelving capacity of the freezer–beginning at the date of the first collapse, November of 1995, and continuing until December of 1997 (when the Modern Equipment system was finally removed). In our view, had Nebraska Beef's warehouse been "suddenly and accident[ally]" rendered inoperable (even if only in a practical sense), the exigency of the circumstances would have required immediate mitigation. Therefore, we conclude that because Nebraska Beef's warehouse was not rendered inoperable by a "sudden and accidental" physical injury, the exception to Exclusion (m) does not apply. In any event, even the limited loss of use of its warehouse allegedly experienced by Nebraska Beef was due to the loss of the use of Modern Equipment's rack system, not from the loss of the use of the warehouse's functional freezing and cooling capacity,  nor from a diminution of its available total cold storage  cubage.

## V. *Conclusion*

Nebraska Beef did not lose the use of its warehouse space, rather it lost only the use of a portion of the Modern Equipment rack system. After the racks collapsed, the dimensions of the warehouse's functioning refrigerator and freezer space remained precisely the same. The warehouse's storage capacity was reduced because the shelving system it purchased from Modern Equipment did not perform as promised. Nebraska Beef acquired replacement racks–and eventually an entirely new system–which had a claim of maximum-storage capacity less than that of the failed system. The alleged reduced warehouse capacity resulted from a substitution of shelving systems because the insured's shelving product did not perform as it had been warrantied. Thus, Exclusion (k) of the policy precludes any duty on Continental Western's part to defend Modern Equipment against the disputed claims contained in Nebraska Beef's lawsuit. Accordingly, the district court's grant of summary judgment in Continental Western's favor is affirmed.

BRIGHT, Circuit Judge, concurring.

I concur in the result.

_____