# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1918
_____

Chicago Insurance Company, an Illinois corporation

*Plaintiff*

v.

City of Council Bluffs; Daniel C. Larsen, in his individual and official capacities; Lyle Brown, in his individual and official capacities

*Defendant*s

------------------------------

Columbia Casualty Company

*Plaintiff - Appellee*

v.

City of Council Bluffs; Daniel C. Larsen; Lyle Brown; David Dawson; Terry J. Harrington

*Defendant*s

Curtis W. McGhee, Jr.

*Defendant - Appellant*

_____

No. 12-1922
_____

Chicago Insurance Company, an Illinois corporation

*Plaintiff - Appellee*

v.

City of Council Bluffs; Daniel C. Larsen, in his individual and official capacities; Lyle Brown, in his individual and official capacities

*Defendants - Appellants*

------------------------------

Columbia Casualty Company

*Plaintiff - Appellee*

v.

City of Council Bluffs; Daniel C. Larsen; Lyle Brown; David Dawson

*Defendants - Appellants*

Terry J. Harrington; Curtis W. McGhee, Jr.

*Defendant*s
_____

Appeal from United States District Court
for the Southern District of Iowa - Council Bluffs
_____

-2-

Submitted: December 12, 2012
Filed: April 30, 2013
_____

Before WOLLMAN, BYE, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

The City of Council Bluffs, police officers Daniel Larsen, Lyle Brown, and David Dawson (collectively the City), and Curtis McGhee appeal from the district court's order granting summary judgment to Chicago Insurance Company (CIC) and Columbia Casualty Company (Columbia), on CIC's and Columbia's declaratory judgment claims concerning coverage under various insurance policies. We affirm as to those policies in effect after 1977, but reverse as to Columbia's 1977-78 policy.

## I. Background

Many of the background facts are set forth in Genesis Insurance Co. v. City of Council Bluffs, 677 F.3d 806 (8th Cir. 2012). We summarize them only briefly here. In 1977, McGhee and Terry Harrington were arrested for the murder of retired police officer John Schweer and were convicted on May 11, 1978, and August 4, 1978, respectively. McGhee and Harrington both received life sentences. In 2003, the Iowa Supreme Court concluded that "Harrington's due process right to a fair trial was violated by the State's failure to produce . . . police reports documenting the[] investigation of an alternative suspect in Schweer's murder." Harrington v. State, 659 N.W.2d 509, 525 (Iowa 2003). McGhee and Harrington were released from prison later that year.

In 2005, McGhee and Harrington brought claims under 42 U.S.C. §§ 1983 and 1985(3) against, among others, the City, alleging violations of civil rights sounding in malicious prosecution. See Genesis, 677 F.3d at 808. The City sought coverage

under the following insurance policies issued by CIC and Columbia: (1) two excess liability policies issued by CIC; (2) five special excess liability policies issued by Columbia; and (3) one commercial umbrella liability policy issued by Columbia.

## A. CIC Excess Liability Policies

CIC issued the City two excess liability policies, one in effect from July 1, 1983, to July 1, 1984; and the other in effect from July 1, 1984, to July 1, 1985. The policies contain Endorsement 6, which reads:

POLICE PROFESSIONAL LIABILITY - FOLLOWING FORM

It is agreed that, except insofar as coverage is available to the Insured in the underlying insurance, this policy shall not apply to Personal Injury or Property Damage caused by Negligent Acts, Errors and/or Omissions of Police Officers including but not limited to[:] false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, assault and battery, libel, slander, defamation of character, violation of property rights, or deprivation of any rights, privileges or immunities secured by the Constitution and the laws of the United States.

Appellants' App. 579.[1] The "underlying insurance" was issued by Admiral Insurance Company.[2] The relevant portions of the policies read:

---

[1]We agree with the district court that, notwithstanding the absence of the word "exclusion," Endorsement 6 is clear, explicit, and enforceable. See, e.g., Essex Ins. Co. v. Fieldhouse, Inc., 506 N.W.2d 772, 776-77 (Iowa 1993) (exclusions contained in "endorsements" were valid and enforceable). See generally Nationwide Agri-Bus. Ins. Co. v. Goodwin, 782 N.W.2d 465, 470 (Iowa 2010) ("An exclusion that is clear and unambiguous must be given effect." (quoting Farm & City Ins. Co. v. Gilmore, 539 N.W.2d 154, 157 (Iowa 1995))).

[2]According to the City, Admiral issued the City six policies, in effect for various one-year periods from 1979 to 1985, under which the City seeks coverage. Appellants' App. 611, 618-51. Admiral is not a party to this case; the City has filed

-4-

INSURING AGREEMENT

In consideration of the payment of premium in reliance upon the statements herein or attached hereto, and subject to all of the terms of this policy, the Company(s) agrees with the Named Insured and will indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay by reason of liability imposed by law, or liability assumed by contract, insofar as the Named Insured may legally do so, for damages because of:

. . . .

COVERAGE D - PERSONAL INJURY LIABILITY

. . . .

to which this policy applies, caused by an occurrence, during the policy period.

Appellants' App. 620. For purposes of Coverage D, the Admiral policies define an "occurrence" as "any injury or damage sustained during the policy term, by any person or organization and arising out of the personal injury as defined herein" and define "personal injury" as including "malicious prosecution[.]" Appellants' App. 625.

B. Columbia Special Excess Liability Policies

Columbia issued the City five special excess liability policies: one in effect from August 8, 1977, to August 8, 1978; one in effect from August 8, 1978, to August

---

a declaratory judgment action seeking coverage against Admiral in the Southern District of Iowa, which currently remains pending. See City of Council Bluffs v. Admiral Ins. Co., No. 4:11-cv-00061-RP-TJS (S.D. Iowa).

8, 1979; one in effect from August 8, 1979, to August 8, 1980; one in effect from August 8, 1980, to August 8, 1981; and one in effect from July 1, 1981, to July 1, 1982. These policies provide that Columbia "will indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages because of . . . personal injury . . . to which this policy applies, caused by an occurrence." Appellants' App. 762. These policies define "personal injury" as including "malicious prosecution" and define an "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the Insured[.]" Appellants' App. 765.

### C. Columbia Commercial Umbrella Liability Policy

Columbia also issued the City a commercial umbrella liability policy, in effect from July 1, 1982, to July 1, 1983, which reads:

1.   COVERAGE A—EXCESS LIABILITY INDEMNITY

The company will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance stated in the schedule. The provisions of the [i]mmediate underlying policy are, with respect to Coverage A, incorporated as a part of this policy, except for any obligation to investigate and defend and pay for costs and expenses incident to any of the same, the amounts of the limits of liability, an "other insurance" provision and any other provisions therein which are inconsistent with this policy.

. . . .

2.   COVERAGE B—EXCESS LIABILITY INDEMNITY OVER RETAINED LIMIT

The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance, or with respect to damages not

-6-

covered by underlying insurance but which result from an occurrence covered by underlying insurance, for loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of

personal injury,
property damage, or
advertising injury

to which this coverage applies, caused by an occurrence.

Appellants' App. 828 (emphasis omitted). The policy defines "personal injury" as:

(1) bodily injury, shock, mental injury or mental anguish,

(2) false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of private occupancy, malicious prosecution or humiliation; except that maliciously inflicted by, at the direction of, or with the consent of the insured[.]

. . . .

Appellants' App. 844 (emphasis omitted). The policy defines an "occurrence" as:

(1) with respect to subsection (1) of the definition of personal injury and with respect to property damage, an accident, including continuous or repeated exposure to conditions, which results, during this policy period, in such personal injury or property damage neither expected nor intended from the standpoint of the insured. All loss arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence,

(2) with respect to subsection[] (2) . . . of the definition of personal injury, an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury. All loss arising out of such act or series of acts, regardless of the frequency

thereof or the number of claimants, shall be deemed to arise out of one occurrence[.]

 . . . .

Appellants' App. 844 (emphasis omitted).

## D.  Declaratory Judgment Actions

CIC and Columbia filed declaratory judgment actions on the issue of coverage. On summary judgment, the district court rejected the "multiple triggers" coverage theory; denied the use of extrinsic evidence for contract interpretation or contract construction purposes; and determined that only the 1977-78 Columbia special excess liability policy potentially provided coverage.  As to that policy, the district court concluded that because the alleged malicious prosecution was not caused by an accident and did not result in unexpected or unintended personal injuries, that policy was inapplicable.  The district court accordingly granted CIC and Columbia summary judgment on each of the policies.

## II.  Discussion

We review *de novo* the district court's grant of summary judgment, "applying the same standards as the district court and viewing the evidence in the light most favorable to the nonmoving party."  Zike v. Advance Am., Cash Advance Ctrs. of Mo., Inc., 646 F.3d 504, 509 (8th Cir. 2011) (quoting Travelers Prop. Cas. Co. of Am. v. Gen. Cas. Ins. Cos., 465 F.3d 900, 903 (8th Cir. 2006)).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"The parties agree that Iowa law governs this diversity action. Under Iowa law, a court must construe insurance policies to give effect to the intent of the parties." Genesis, 677 F.3d at 811 (quoting R & J Enterprizes v. Gen. Cas. Co. of Wis., 627 F.3d 723, 726 (8th Cir. 2010)).

> The rules of construction of insurance policies [under Iowa law] are well established. The insurance policy is a contract which must be construed as a whole. The words used must be given their ordinary, not technical, meaning to achieve a practical and fair interpretation. Youngwirth v. State Farm Mut[.] Auto. Ins. Co., [140 N.W.2d 881, 884 (Iowa 1966)].
>
> If the words are fairly susceptible to two interpretations the one which will sustain the insured's claim will be accepted. Thus the policy will be strictly construed against the insurer. State Auto. & Cas. Underwriters v. Hartford Acc[ident] & Ind[em.] Co., [166 N.W.2d 761, 763 (Iowa 1969)]. This rule is amplified by the statement that the court should ascertain what an insured as a reasonable person would understand the policy to mean, not what the insured actually intended. Goodsell v. State Auto[.] & Cas. Underwriters, [153 N.W.2d 458, 461 (Iowa 1967)].
>
> Stated otherwise, the climate under which an insurance policy is examined favors imposition of coverage largely because the carrier drew the contract and has the expertise in the field. However, if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract issued, the insurer has no duty to defend or indemnify. Hagen Supply Corp. v. Iowa Nat['l] Mut[.] Ins. Co., [331 F.2d 199, 203-04 (8th Cir. 1964),] and authorities cited therein. If such be the case, the words and phrases of the policy should not be strained to impose liability that was not intended and not purchased.

Cent. Bearings Co. v. Wolverine Ins. Co., 179 N.W.2d 443, 445 (Iowa 1970), *quoted*

*in* Genesis, 677 F.3d at 811. "Insurance disputes are particularly well suited for summary judgment because the proper construction of an insurance contract is always an issue of law for the court." Genesis, 677 F.3d at 811 (quoting Modern Equip. Co. v. Cont'l W. Ins. Co., 355 F.3d 1125, 1128 (8th Cir. 2004)).

> The City [and McGhee] ha[ve] the initial burden of proving that [Harrington's and McGhee's] disputed claims are comprehended by the policy's general coverage provisions. Once this burden is met, [CIC and Columbia] must in turn prove the applicability of any exclusion which allegedly precludes coverage. Thereafter, the burden . . . shifts back to [the City and McGhee] to prove, if applicable, any exception to the exclusion.

Id. (third alteration and omission in original) (internal quotation marks and citations omitted).

## A. Extrinsic Evidence

The City and McGhee argue that the district court should have considered extrinsic evidence concerning the parties' intent and that the district court should have granted their motions for discovery of additional, related extrinsic evidence. We review *de novo* the district court's interpretation of state law. Super Wings Int'l, Ltd. v. J. Lloyd Int'l, Inc., 701 F.3d 870, 873 (8th Cir. 2012).

Under Iowa law, the admissibility of extrinsic evidence depends on the purported purpose of the evidence, that is, contract interpretation or contract construction. Contract "[i]nterpretation involves ascertaining the meaning of contractual words; [contract] construction refers to deciding their legal effect." Peak v. Adams, 799 N.W.2d 535, 543 (Iowa 2011) (quoting Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp., 266 N.W.2d 22, 25 (Iowa 1978)). Though admissible for interpretation purposes, see Pillsbury Co. v. Wells Dairy, Inc., 752 N.W.2d 430, 436 (Iowa 2008), extrinsic evidence is admissible for construction purposes only when the contract is ambiguous, see Peak, 799 N.W.2d at 543.

The City and McGhee do not identify what policy terms the extrinsic evidence would aid in interpreting. Instead, they argue generally that the extrinsic evidence would establish that the parties "believed and intended that coverage be provided." Appellants' Br. 32. This, however, is an improper attempt "to alter the meaning of the contract, not to facilitate its interpretation[.]" See Mid-Am. Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 973 (8th Cir. 2005) (applying Iowa law). Nor do the City and McGhee identify any ambiguity that the extrinsic evidence would resolve. "In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says." Peak, 799 N.W.2d at 543 (quoting Iowa R. App. P. 6.904(3)(n)). Accordingly, the district court correctly refused to consider and correctly denied additional discovery of the extrinsic evidence.

## B. Multiple Triggers

The City and McGhee argue that coverage is available under each of the CIC and Columbia policies because McGhee's and Harrington's alleged injuries and damages span the duration of their imprisonment.

Following the district court's grant of summary judgment in the present action, our court decided Genesis, which, as described above, was a related action concerning whether two insurance policies issued by Genesis Insurance Company (Genesis) afforded coverage to the City for liability arising from McGhee's and Harrington's claims. 677 F.3d at 808-10. The Genesis policies provided coverage for losses "because of . . . personal injury . . . which occur[ed] during this policy period[.]" Id. at 809 (emphasis omitted). The "personal injury" had to have been "caused by an occurrence[,] and the occurrence must [have] take[n] place in the coverage territory." Id. The policies defined an "occurrence" as "an offense or series of related offenses" and defined "offense" as "any of the offenses included in the definition[] of . . . personal injury." Id. at 810. And, the policies defined "personal injury" as including "injury . . . arising out of . . . malicious prosecution[.]" Id. at 809. Thus, to be entitled

-11-

to coverage, the City was required to prove that at least one of either "Harrington or McGhee [was] seeking damages for an injury . . . arising out of malicious prosecution or a civil rights violation, that occur[red] during [the] policy period." Id. at 812 (omission and second and third alterations in original) (internal quotation marks and citations omitted). Because the court predicted that the Iowa Supreme Court would hold that "the tort of malicious prosecution occurs, for insurance purposes, on the date the underlying charges are filed[,]" the court concluded that the policies offered no coverage for McGhee's and Harrington's claims. Id. at 816 (quoting City of Erie, Pa. v. Guar. Nat'l Ins. Co., 109 F.3d 156, 165 (3d Cir. 1997)).

The City and McGhee of course recognize the holding in Genesis, but argue that the CIC and Columbia policies contain different language that yields different results.[3] They argue that the Columbia policies, unlike the Genesis policies, require only that some injury arise during the policy period, and that the injury need not occur first during the policy period. Similarly, they argue that the CIC policies require only that some injury or damage arise sometime during the policy period. They further argue that because McGhee and Harrington allege injuries and damages spanning the duration of their imprisonment, the CIC and Columbia policies provide coverage.

We see no meaningful distinction between the Columbia policies that would necessitate a result different from that reached in Genesis. The Columbia policies require that the alleged injuries have been sustained during the respective policy coverage periods. The holding from Genesis—that "Harrington's and McGhee's injuries 'occurred,' for insurance purposes, in 1977" and "did not 'occur,' for insurance purposes, [between 2002 and 2004]"—is equally forceful when applied to the Columbia policies. Id. at 815. Indeed, the City's contention that "there are allegations of continuing misconduct and continuing personal injury during the terms

_____

[3]To the extent the City and McGhee challenge Genesis, we note that "[i]t is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel." Sisney v. Reisch, 674 F.3d 839, 843 (8th Cir. 2012) (quoting Owsley v. Luebbers, 281 F.3d 687, 690 (8th Cir. 2002)).

of the . . . policies" was expressly rejected in <u>Genesis</u>. <u>See</u> <u>id.</u> ("But we reject the contention that 'the tort of malicious prosecution constitutes a continuing injury.'" (quoting <u>City of Erie</u>, 109 F.3d at 164)); <u>see also</u> <u>Royal Indem. Co. v. Werner</u>, 979 F.2d 1299, 1300 (8th Cir. 1992) (explaining that for purposes of malicious prosecution insurance coverage, the term "personal injury" was "more likely intended to describe the time when harm begins to ensue, when injury occurs to the person, that is, . . . when the relevant law suit is filed").

We also conclude that the CIC policies are controlled by <u>Genesis</u>. The CIC policies, by virtue of the Admiral policies, define an occurrence as "any injury or damage . . . arising out of the [malicious prosecution.]" The City and McGhee contend that because, unlike the policies in <u>Genesis</u>, the CIC policies define an occurrence as "any . . . damage[,]" the CIC policies are triggered by the damages alleged by McGhee and Harrington from their imprisonment while the CIC policies were in effect. The issue whether McGhee's and Harrington's imprisonment could constitute "damage" contemplated by the CIC policies aside, this theory is essentially the same "multiple trigger" approach to the tort of malicious prosecution that was rejected in <u>Genesis</u>. In <u>Genesis</u>, our court explained:

> [I]n malicious prosecution cases, there is no interval between arrest and injury that would allow an insurance company to terminate coverage. The plaintiff faces incarceration, humiliation, and damage to reputation as soon as charges are filed. Perhaps for this reason, no federal or state court has adopted the multiple trigger theory in malicious prosecution cases.

677 F.3d at 815-16 (quoting <u>City of Erie</u>, 109 F.3d at 165).

We also reject the City and McGhee's arguments that rely on extrinsic evidence, <u>see</u> *supra* Section II(A), as well as their arguments of ambiguity, <u>see</u> <u>Genesis</u>, 677 F.3d at 815 ("Although the City and Genesis 'disagree about the terms of their insurance policies, disagreement between the parties over the proper

interpretation of a contract does not necessarily mean that a contract is ambiguous.'" (quoting City of Erie, 109 F.3d at 163)).

Accordingly, we consider only whether the Columbia special excess liability policy in effect from August 8, 1977, to August 8, 1978, remains potentially applicable, because the alleged malicious prosecution and resulting personal injuries occurred when the underlying charges were filed against McGhee and Harrington, in 1977.

C.  1977-78 Columbia Special Excess Liability Policy

The City and McGhee argue that the district court erred in concluding that the 1977-78 Columbia special excess liability policy offered no coverage.  The policy covers losses incurred as a result of damages from malicious prosecution that are "caused by an occurrence" and defines an occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury . . . neither expected nor intended from the standpoint of the Insured[.]" Appellants' App. 762, 765.

The City and McGhee argue that, although McGhee's and Harrington's alleged injuries were intentional, not accidental, coverage should nonetheless be afforded under the reasonable expectations doctrine.[4]  "Under the reasonable expectations doctrine, 'the objectively reasonable expectations of applicants and intended beneficiaries regarding insurance policies will be honored even though painstaking study of the policy provisions would have negated those expectations.'" Johnson v. Farm Bureau Mut. Ins. Co., 533 N.W.2d 203, 206 (Iowa 1995) (quoting Clark-

---

[4]Although the district court found the City and McGhee's argument concerning the reasonable expectation doctrine not to be sufficiently supported with explanation or analysis, see D. Ct. Order of Mar. 12, 2012, at 34, we conclude that the argument was sufficiently developed to merit consideration on appeal.

Peterson Co. v. Indep. Ins. Assocs., Ltd., 492 N.W.2d 675, 677 (Iowa 1992)). The doctrine applies when an exclusion "(1) is bizarre or oppressive, (2) eviscerates terms explicitly agreed to, or (3) eliminates the dominant purpose of the transaction." Boelman v. Grinnell Mut. Reinsurance Co., 826 N.W.2d 494, 506 (Iowa 2013) (quoting Clark-Peterson, 492 N.W.2d at 677). "For the doctrine to apply, a prerequisite must first be satisfied[:] '[t]he insured must prove circumstances attributable to the insurer that fostered coverage expectations or show that the policy is such that an ordinary layperson would misunderstand its coverage.'" Id. (emphasis omitted) (quoting Nationwide Agri-Bus., 782 N.W.2d at 473).

The City and McGhee rely on Clark-Peterson, where the plaintiff became liable in another suit for damages arising from intentional discrimination and sought coverage under an insurance policy. 492 N.W.2d at 676. Despite defining "personal injury" as including "discrimination[,]" the policy effectively eliminated such coverage by requiring that any occurrence "unexpectedly or unintentionally result[]" in the personal injury, and by excluding coverage of discrimination "committed by or at [the insured's] direction[.]" Id. at 676-77 & n.3. The Iowa Supreme Court held that the plaintiff was entitled to coverage under the reasonable expectations doctrine because an ordinary layperson would expect coverage under these circumstances and because a holding of no coverage would "eviscerate[] terms explicitly agreed to." Id. at 677-79. The court explained:

> To deny discrimination coverage in the present case would be to withdraw with the policy's left hand what is given with its right. In a fundamental sense, of course, this is the proper function of any exclusion clause in an insurance policy. The reasonable expectations doctrine does no violence to this proper function by its limited intrusion into it. The doctrine means only that when, within its metes and bounds definition, an exclusion acts in technical ways to withdraw a promised coverage, it must do so forthrightly, with words that are, if not flashing, at least sufficient to assure that a reasonable policy purchaser will not be caught unawares.

The reasonable expectations doctrine is a recognition that insurance policies are sold on the basis of the coverage they promise. When later exclusions work to eat up all, or even substantially all, of a vital coverage, they cannot rest on technical wording, obscure to the average insurance purchaser. At some point fairness demands that the coverage clause itself be self-limiting. Clark-Peterson's claim could not have arisen if the coverage promised in the coverage clause had been clearly worded so as to extend coverage only as far as the insurer contends it does extend. The difficulty arises because a much broader coverage is promised, but an attempt is made to withdraw it in violation of the doctrine of reasonable expectations.

Id. at 679.

The 1977-78 Columbia special excess liability policy technically excludes expected damages arising from intentional acts; nevertheless, given the policy's express inclusion of coverage for damages arising from "malicious prosecution[,]" we conclude that an ordinary layperson would have misunderstood the policy's scope of coverage. See id. at 678 ("We also think the answer is clearly yes, that an ordinary layperson could expect coverage. The policy purports to provide some discrimination coverage; the insured here seeks coverage for an unusual and controversial liability, liability which no doubt came as a shock to it." (footnote omitted)). In addition, enforcement of the Columbia policy's requirement that personal injuries be caused by "an accident" and result in personal injuries "neither expected nor intended from the standpoint of the insured" would effectively "eviscerate[] terms explicitly agreed to," namely, coverage for damages arising from malicious prosecution—an intentional tort. See Wilson v. Hayes, 464 N.W.2d 250, 259 (Iowa 1990) (elements of a malicious prosecution claim). Columbia's speculation that the policy provisions could, under some circumstances, be harmonized so as to provide coverage for damages arising from malicious prosecution, is unpersuasive, for "evisceration can occur on something less than total obliteration of all possibilities of coverage." See Clark-Peterson, 492 N.W.2d at 678.

-16-

Because the reasonable expectations doctrine applies to the facts of this case, the City is entitled to coverage under the 1977-78 Columbia special excess liability policy. In light of this holding, we need not address the City and McGhee's alternate argument that the policy is ambiguous.

## III. Conclusion

We affirm the district court's judgment that the following policies do not afford coverage to the City for McGhee's and Harrington's malicious prosecution claims: the two excess liability policies issued by CIC; four of the special excess liability policies issued by Columbia; and the commercial umbrella liability policy issued by Columbia. As to the 1977-78 special excess liability policy issued by Columbia, we reverse the district court's judgment regarding the applicability of the reasonable expectations doctrine. The case is remanded to the district court for further proceedings.

BYE, Circuit Judge, concurring in part and dissenting in part.

I agree the 1977-78 policy Columbia Casualty Company (Columbia) issued to the City of Council Bluffs provides coverage for the malicious prosecution claims brought by Curtis McGhee and Terry Harrington. I also agree the five special excess policies Columbia issued to the City between August 1977 and July 1982 do not provide coverage because the provisions in those policies are governed by our decision in Genesis Insurance Co. v. City of Council Bluffs, 677 F.3d 806 (8th Cir. 2012). I disagree, however, with the majority's conclusion that the two excess policies Chicago Insurance Company (CIC) issued to the City for the period between July 1983 and July 1985 are governed by Genesis and therefore do not provide coverage. As a result, I respectfully concur in part and dissent in part.

As the majority acknowledges, the two CIC excess policies provide coverage if the underlying Admiral policies would provide coverage. The Admiral policies, in relevant part, provide personal injury liability coverage for damages "caused by an

occurrence, during the policy period." Appellants' App. 620. Significantly, two distinct coverage-triggering events are defined as occurrences under the Admiral policies: either "injury *or* damage sustained during the policy term . . . arising out of the personal injury as defined herein" is considered an "occurrence." Id. at 625 (emphasis added). Personal injury is defined to include "malicious prosecution." Id. Thus, damage sustained during the policy term and arising out of a malicious prosecution is a coverage-triggering event under the Admiral policies.

Under Genesis, we held the "injury" consisting of the malicious prosecution itself occurred, for insurance purposes, on the date the underlying charges were filed. 677 F.3d at 812. But in Genesis, the only coverage-triggering event defined as an "occurrence" was the "injury" itself. Id. at 809. In sharp contrast, the Admiral policies plainly and unambiguously include "damage sustained during the policy term" arising out of a malicious prosecution as a coverage-triggering occurrence, separate and apart from the malicious prosecution itself. By defining not only the injury as an occurrence, but also damage arising out of the injury as a separate coverage-triggering occurrence, the terms of the Admiral policies show a clear intent to provide coverage for the continuing tort of malicious prosecution.

McGhee and Harrington sustained damage arising out of the malicious prosecution from 1978 through 2003, the year the two men were finally released from prison. The period of time during which the two men were imprisoned included July 1983 through July 1985. Thus, McGhee and Harrington clearly sustained damage arising out of the 1978 malicious prosecution during the time the CIC excess policies were in effect. Nowhere do the CIC/Admiral policies limit coverage only to an injury occurring during the policy period, unlike the policies interpreted in Genesis. Since "damage sustained during the policy term" is expressly included as a coverage-triggering occurrence under the Admiral policies, the majority errs when it concludes the two CIC excess policies are governed by Genesis, which involved dispositively different policy provisions.

In rejecting the City's straightforward attempt to enforce the plain and unambiguous terms of the CIC/Admiral policies, the majority effectively removes the word "damage" from the two Admiral policies as a distinct and separate coverage-triggering "occurrence." The majority justifies rewriting the terms of the CIC/Admiral policies by claiming the City's argument "is essentially the same 'multiple trigger' approach to the tort of malicious prosecution that was rejected in Genesis." Ante at 13. I could not disagree more.

The City's argument is not the same argument rejected in Genesis for the plain and simple reason that the policy terms involved here are different from the policy terms interpreted in Genesis, and the difference is dispositive. Under Iowa law, "[o]ccurrence policies provide coverage if the incident insured against occurs during the policy period." Tacker v. Am. Family Mut. Ins. Co., 530 N.W.2d 674, 676 (Iowa 1995). The Admiral policies unambiguously insure against damage sustained during the policy term arising out of a malicious prosecution. As a court, we should not rewrite the terms of an insurance policy and replace them with some hypothetical language an insurer wishes it had used. Instead, our task should be limited to interpreting and enforcing the terms of the policy before us, as written.[5]

The majority's cryptic justification for not enforcing the plain language of the CIC/Admiral policies is because "no federal or state court has adopted the multiple

---

[5]As the author of the majority opinion has noted, "the terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing it so as to bind the insurer to a risk which is plainly excluded and for which it was not paid." Grisham v. Commercial Union Ins. Co., 951 F.2d 872, 875 (8th Cir. 1991) (citation omitted). We refrain from rewriting the terms of a policy because to do so "would fly in the face of the principle that courts should not indulge in a forced construction outside the intent of either party." Id. (citations and internal quotation marks omitted). The same principles apply when an insured is asking a policy to be enforced as written, to require an insurer to provide coverage for a risk plainly included within the policy's coverage terms, and consistent with the intent of both parties. The majority's opinion defies the same well-worn principles the author once touted.

trigger theory in malicious prosecution cases." Ante at 13 (quoting Genesis, 677 F.3d at 815-16 (in turn quoting City of Erie, Pa. v. Guar. Nat'l Ins. Co., 109 F.3d 156, 165 (3d Cir. 1997)). The fact that no state or federal court has adopted a multiple trigger theory when interpreting a multiple trigger policy is hardly remarkable, and not a valid reason for rewriting an insurance contract, especially when those state and federal courts have not interpreted the policy provisions we are called upon to interpret.[6] Indeed, in addition to already having the benefit of the plain and unambiguous language of the Admiral policies to support my argument, I can similarly claim that no federal or state court has ever ***denied*** coverage when interpreting the insurance provisions involved in this case.

The majority's invalid reason for refusing to enforce the CIC/Admiral policies can only be interpreted as the adoption of a *per se* rule prohibiting enforcement of multiple trigger insurance coverage in malicious prosecution cases as a matter of policy–no matter what the insurance contract says–merely because it has not been done before. In a case where the terms of the insurance contract are unambiguous and evince a clear intent to cover subsequent damage arising out of a malicious prosecution, the only valid reason for refusing to enforce the contract would be on policy grounds. What is disturbing about the majority's approach, however, is its decision to invalidate unambiguous contract language as a matter of policy without addressing the propriety of that approach under Iowa law.

---

[6]I have already explained that the policy terms in Genesis are dispositively different from the policy terms at issue here. Similarly, the policy provisions in City of Erie are not the same. There, one group of the insurance policies at issue applied "only to acts committed or alleged to have been committed during the policy period" while the other group of policies only provided coverage for "'bodily injury', 'property damage' or 'personal injury' . . . occurring during the policy period as a result of a 'law enforcement incident.'" 109 F.3d at 158 n.4. The majority does not cite any cases involving a policy where damage sustained during the policy term and arising out of a malicious prosecution was a separate coverage-triggering event from the malicious prosecution itself.

The Iowa courts have never addressed a multiple trigger approach in a malicious prosecution case and therefore have never rejected the theory. Iowa law does not suggest the state would reject the theory, either, and thus shows the majority's invalidation of the CIC/Admiral policies is unjustified.

The Iowa Supreme Court has repeatedly instructed courts to exercise caution before excising terms from an insurance contract on policy grounds. See Robinson v. Allied Prop. & Cas. Ins. Co., 816 N.W.2d 398, 408 (Iowa 2012); Thomas v. Progressive Cas. Ins. Co., 749 N.W.2d 678, 687 (Iowa 2008); Grinnell Mut. Reinsurance Co. v. Jungling, 654 N.W.2d 530, 540 (Iowa 2002); Shelter Gen. Ins. Co. v. Lincoln, 590 N.W.2d 726, 730 (Iowa 1999); DeVetter v. Principal Mut. Life Ins. Co., 516 N.W.2d 792, 794 (Iowa 1994); Walker v. Am. Family Mut. Ins. Co., 340 N.W.2d 599, 601 (Iowa 1983); Skyline Harvestore Sys., Inc. v. Centennial Ins. Co., 331 N.W.2d 106, 109 (Iowa 1983).

Under Iowa law, "[i]t is not the court's function to curtail the liberty to contract by enabling parties to escape their valid contractual obligation on the ground of public policy unless the preservation of the general public welfare imperatively so demands." Tschirgi v. Merchants Nat. Bank of Cedar Rapids, 113 N.W.2d 226, 231 (1962) (citing Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353 (1931)). "This is a patently high standard." Aurora Nat'l Life Assurance Co. v. Harrison, 462 F. Supp. 2d 951, 971 (S.D. Iowa 2006). "[F]or a court to undertake to invalidate private contracts upon the ground of public policy is to mount a very unruly horse, and when you once get astride it you never know where it will carry you." Skyline, 331 N.W.2d at 109 (internal quotation marks and citation omitted).

Thus, Iowa law requires an insurer to identify general public welfare interests that prohibit enforcement of an insurance policy before a court is justified in refusing to enforce the policy as written. Neither the majority nor the insurers involved in this case have identified any general public welfare interests implicated by the

enforcement of the CIC/Admiral policies, let alone implicated to the point where invalidation of the contracts is "imperatively" demanded.

For the reasons stated, I respectfully dissent from the majority's refusal to enforce the plain and unambiguous terms of the CIC/Admiral policies, but otherwise concur in the rest of the majority's decision.

_____